# EXHIBIT 6

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

KG Schiffahrtsgesellschaft MS Pacific Winter

**Claimant Owner**

and

Safesea Transport Inc

**Respondent Charterer**

Charter Party dated 14th December 2016

MV "Pacific Winter"

_____

**FINAL AWARD**

_____

**Whereas:**

**(A)** By a Charter Party dated 14th December 2016 on an amended HEAVYLIFTVOY form to which a number of additional terms and conditions had been added ("the Charter Party"), the Claimant, KG Schiffahrstsgesellschaft MS Pacific Winter ("the Owner") of Jork, Germany, chartered their general cargo ship MV "Pacific Winter" to the Respondent, Safesea Transport Inc ("the Charterer") of Piscataway, New Jersey, USA for one voyage from St Petersburg and, at the time of the agreement also from Antwerp although the Antwerp cargo was cancelled by mutual consent, to Kolkata for the carriage of project cargoes as more particularly set out in the Charter Party.

**(B)** Clause 41 of the Charter Party provided for any dispute thereunder to be referred to arbitration in London in a manner as fully set out in the Reasons of this Award and for the Charter Party to be governed by English law.

**(C)** Disputes having arisen between the parties, on 14th February 2017, the Owner appointed me, Donald Chard of 33, Maryland Road, Tunbridge Wells, Kent TN2 5HE, as arbitrator. I accepted the appointment on LMAA Terms (2012). The Charterer was informed of my appointment on 14th February 2017. The Charterer failed to make its own appointment within the required 14 day period and was informed by the Owner on 7th March 2017, that I had been appointed as sole arbitrator in the reference. The seat of arbitration is London, England.

**(D)** The disputes referred to me concerned the Owner's claims as more fully set out in the Reasons of this Award which are annexed to and form part hereof. The claims came within the monetary limits of the LMAA Intermediate Claims Procedure (2012) and was conducted by reference to documentation supplied and without an oral hearing.

**(E) NOW I,** the said Donald Chard, having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the evidence put before me and having given weight thereto, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD** as follows:

**(1) I FIND, HOLD AND DECLARE** that the Owner's claims are not time-barred.

**(2) I FIND, HOLD AND DECLARE** that the Owner's claim for the balance of outstanding demurrage succeeds in the sum of USD27,989.47 and no more and **I AWARD AND DIRECT** that the Charterer shall forthwith pay to the Owner the said amount of **USD27,989.47 (US Dollars twenty seven thousand, nine hundred and eighty nine and forty seven cents only) PLUS** interest on the Award at the average rate of 4.5% (four and one half per cent) per annum or pro rata compounded at three monthly rests from 30th January 2017 up to the date of this Award and thereafter at the same rate and on the same terms until the date of payment by the Charterer.

**(3) I FURTHER FIND, HOLD AND DECLARE** that the Owner's claim for damages for detention succeeds in the sum of USD 60,571.87 and no more and **I AWARD AND DIRECT** that the Charterer shall forthwith pay to the Owner the said amount of **USD60,571.87 (US Dollars sixty thousand, five hundred and seventy one and eighty seven cents only) PLUS** interest on the Award at the average rate of 4.5% (four and one half per cent) per annum or pro rata

compounded at three monthly rests from 3rd August 2017 up to the date of this Award and thereafter at the same rate and on the same terms until the date of payment by the Charterer.

**(4) AND I FURTHER FIND, HOLD AND DECLARE** that the Owner's claim for interest on late payments succeeds in the sum of USD7019.73 and no more and **I AWARD AND DIRECT** that the Charterer shall forthwith pay to the Owner the said amount of **USD 7019.73 (US Dollars seven thousand and nineteen and seventy three cents only) PLUS** interest on the Award at the average rate of 4.5% (four and one half per cent) per annum or pro rata compounded at three monthly rests from the date of this Award until the date of payment by the Charterer.

**(5) I AWARD AND DIRECT THAT** the Charterer shall bear its own and pay the Owner's recoverable costs of this reference which I have assessed at **£10,022.81 (Pounds sterling ten thousand and twenty two and eighty one pence only)** together with interest thereon at the rate of 4.5% (four and one half per cent) per annum or pro rata compounded at three monthly rests, to run from the date of this Award **AS WELL AS** the costs of this my **FINAL AWARD** in the sum of **£3,450.00 (Pounds sterling three thousand four hundred and fifty only)** inclusive of my fees and interlocutory charges, **PROVIDED ALWAYS** that if, in the first instance the Owner shall have paid any amount in respect of the costs of the Award, the Owner shall be entitled to immediate reimbursement by the Charterer of any sum or sums so paid, together with interest thereon at the rate of 4.5% (four and one half per cent) per annum or pro rata compounded at three monthly rests, to run from the date of payment by the Owner until the date of reimbursement.

**(6) THIS AWARD IS FINAL** as to the matters herein determined.

**GIVEN** under my hand this 15th day of February 2018

_____

**Donald Chard**

## Reasons attached to and forming part of the Award

**Background**

**1.** By a Charter Party dated 14th December 2016 on an amended HEAVYLIFTVOY form to which a number of additional terms and conditions had been added ("the Charter Party"), the Claimants, KG Schiffahrstsgesellschaft MS Pacific Winter ("the Owner") of Jork, Germany, chartered their general cargo ship MV "Pacific Winter" to the Respondent, Safesea Transport Inc ("the Charterer") of Piscataway, New Jersey, USA for one voyage from St Petersburg and, at the time of the agreement also from Antwerp although the Antwerp cargo was cancelled by mutual consent, to Kolkata for the carriage of project cargoes as more particularly set out in the Charter Party.

**2.** I was provided with an unsigned copy of the Charter Party comprising Part I box layout and Part II terms and conditions with additional clauses 44-52. The following terms are relevant to the disputes before me:

***Box 8*** "free in" with laytime 48 hours for St. Petersburg;

***Box 9*** "Liner-out hook";

***Box 10*** Layday period (i) First layday For St. Petersburg: 19.12.2016 […];

***Box 15*** Freight USD280,000.00 for the proportion of cargo ex-St Petersburg;

***Box 18*** Demurrage/Damages for detention USD10,000.00 per day pro rata with the proviso that "The Carrier grants 18 hours grace time cumulative port of Loading Antwerp and Port of discharging prior charging damage [sic] for detention";

***Box 27*** Dispute Resolution London (Clause (a) of Clause 41);

***Clause 9 Free-in***

*(b) The Cargo shall be brought alongside the Vessel in a sequence as required by the Carrier and shall be loaded, stowed, lashed and seafastened by the Merchant at his risk and expense […]*

*(f) Allowed Laytime at the Loading Port shall be as stated in Box 8, Saturdays, Sundays (or their local equivalents) and holidays included.*

*Time shall count as laytime at the Loading Port, always in accordance with Sub-clause 6 (c), as from the moment the Master tenders Notice of Readiness […]*

*[…] Any time by which the time used exceeds the allowed laytime shall be paid as demurrage at the rate stated in Box 18 per day or pro rata.*

***Clause 16***

*[...] actual time lost on the Vessel due to impediments beyond the Carrier's control preventing the Vessel from departing the Discharging berth/port will count as laytime or be charged as time for which damages for detention are due at the rate as stated in <u>Box18</u>.*

**Clause 18 Freight/Demurrage/Detention**

*(a) The freight stipulated in <u>Box 15</u> shall be paid within three (3) banking days after completion of loading or no later than prior to the commencement of discharge at the first Discharging Port, whichever occurs first. The freight shall be deemed earned upon completion of loading and shall be non-returnable whether the Vessel and/or Cargo is lost or not lost. The freight shall be paid in full without any deductions in the currency and to the Carrier's bank account stated in <u>Box 16</u>. Freight shall not be considered paid until received into the Carrier's bank account.*

*(b) Any sums for demurrage and/or detention shall be payable on receipt of the Carriers' invoice by the Merchant. Payments shall be made to the Carrier's bank account as stated in <u>Box 16</u>.*

**Clause 28 Interest**

*If any amounts due under this Charter Party are not paid when due, then interest at the rate of 1.5% per month or pro rata for part of a month shall be paid on all such amounts until payment is received.*

**Clause 41 BIMCO Dispute Resolution Clause**

*(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.*

*[...]*

*In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 [...] the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure [...]*

*In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of US$400,000 [...] the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceeding [sic] are commenced.*

*Where the reference is to three arbitrators the procedure for making appointments shall be in accordance with the procedure for full arbitration stated above.*

**3.** In accordance with the terms and conditions of the Charter Party, the Charterer's cargo was loaded at the port of St Petersburg and discharged at the Port of Kolkata.

**The Owner's claims**

**4.** Disputes arose between the parties. The Owner claims the following sums said to be due and owing:

(a) the balance of demurrage at the Port of St Petersburg: USD27,989.47;

(b) damages for detention at the Port of Kolkata: USD60,571.87;

(c) interest due on late payment of freight: USD3,822.00;

(d) interest due on late payment of the amount of demurrage already paid: USD3,321.02

together with interest on outstanding amounts and costs.

**Conduct of the reference**

**5.** On 14th February 2017, Schutzverein Deutscher Rheder V.a G. ("Schutzverein") appointed me, Donald Chard of 33, Maryland Road, Tunbridge Wells, Kent TN2 5HE, as arbitrator in respect of claims that their member, the Owner, had against the Charterer. I accepted the appointment the same day in accordance with the current (2012) Terms of the LMAA.

**6.** The Charterer was informed of my appointment on 14th February 2017 by e-mail, and also served through a notary public in New Jersey on 16th February 2017. In accordance with the provisions of Clause 41 of the Charter Party, the Charterer was requested to appoint its arbitrator. The Charterer failed to make its own appointment within the required 14 day period and on 7th March 2017, Schutzverein informed the Charterer that I had been appointed as sole arbitrator in the reference.

**7.** By e-mail sent to me on 28th August 2017, Schutzverein referred to my appointment and said, in material part: "In the meantime the parties have tried to settle the dispute amicably which was unfortunately not successful. Therefore, we hereby serve the attached claim submissions together with the enclosure on behalf of the claimant."

8. The parties had agreed at Clause 41 that for any claim between USD50,000 and USD 400,000, arbitration would be conducted in accordance with the LMAA Intermediate Claims Procedure (ICP). On 4th September 2017, I informed the parties that as the claim was within such limits, I would conduct the refence in accordance with ICP (2012) which was the procedure applicable at the time the arbitration was commenced in February 2017.

9. The Charterer applied to me on 2nd October 2017 for an additional 30 days to respond to the Owner's Claims Submission. No objections were raised by the Owners.

10. On 3rd November 2017, Points of Defence and Requests for Disclosure were served by the Law Offices of Simon Harter Esq, of Princeton, New Jersey, acting on behalf of the Charterer ("the Charterer's Lawyer"). The Charterer's Lawyer raised the question of a time-bar and asked whether I would address the matter as a preliminary issue.

11. I informed the parties the same day that I would deal with the time-bar in my Award on the merits of the dispute. I also set a timetable for the Requests for Disclosure and Owner's Reply Submissions.

12. On 16th November 2017, Kennedys in London informed me and the Charterer's Lawyer that they had been appointed to act on behalf of Schutzverein and their member, the Owner. I now refer to Kennedys as "the Owner's Solicitor".

13. The Owner's Solicitor responded to the application for disclosure on 17th November 2017. Documents for the Vessel's logs, stability calculation, draft forecast for Kolkata and certain correspondence between the Vessel and agent, were provided. The Charterer's Lawyer's request for disclosure of documents relating to third party claims or invoiced amounts relating to the period when the Owner declined to depart the discharging port were refused on grounds of relevance. However, following party exchanges and although maintaining their position about relevance, the requested documents were provided by the Owner's Solicitors on 6th December 2017 "to avoid an escalation of costs and further time being spent on this issue".

14. The Owner's Solicitor served Reply Submissions on 24th November 2017. The parties' Closing Submissions and a breakdown of their respective costs were duly served in accordance with my timetable.

**The Time-bar**

15. I shall deal first with the Charterer's defence that the Owner's claims are time-barred.

16. The Charterer's Lawyer has argued that ICP (2012) provides at paragraph 6 (b) that "Claims submissions […] shall be served by the Claimant within 14 days of the appointment of the second member of the tribunal or the appointment of a sole arbitrator […]". The Claims Submissions were served on 28th August 2017 considerably beyond the laid down 14 days required under ICP (2012).

17. The Charterer's Lawyer denied Schutzverein's contention, set out at paragraph 7 (above), relating to settlement discussions. The Charterer's Lawyer provided me with an e-mail dated 3rd August 2017, from Schutzverein which said:

"We come back to our e-mail of 27th April 2017 in which we have indicated that we would start drafting the claim submissions.

We have now finalized the draft of the submissions which is attached for your attention."

The remainder of the contents were redacted as they addressed "without prejudice" settlement discussions. It is therefore contended that, contrary to the implication in Schutzverein's covering note to the Claims Submissions served on 28th August 2017, the parties were not engaged in settlement discussions between 27th April 2017 and 3rd August 2017.

18. The Charterer's Lawyer further argued that even if settlement discussions were underway, the Owner should have preserved its rights by applying for an extension of time in accordance with ICP (2012) paragraph 12 which states:

"Any extension of the time limits set forth in this Procedure shall be applied for before expiry of the existing time limit. If a party fails to comply with the relevant step in the proceedings within the time limit set for the performance thereof the tribunal, on the application of the other party or of its own motion, shall notify the defaulting party that unless it complies within a fixed period (maximum 21 days) it will proceed to its award on the basis of the submissions and documents before it to the exclusion of all others. <u>(In the case of a failure to serve claim submissions, the tribunal has the power to make and shall make an award dismissing the claim unless the tribunal is satisfied that it would not be just to require service of claims submissions at that time, in which event the tribunal will extend time as it deems appropriate).</u> Any submissions, documents, witness statements, or expert evidence submitted by the defaulting party subsequent to expiry of the time limit set by the tribunal's notice shall not be admissible."

19. The underlined emphasis has been added by the Charterer's Lawyer to argue that the "twenty-one day safe harbour" provision otherwise applicable to a failure to comply with the ICP (2012) time limits, does not apply to claims submissions. This paragraph directs that the Tribunal "shall" dismiss the claim unless it would not be just to require service of claims submissions at that time but that any such determination must be made at the time the claims submissions are due.

20. The Charterer's Lawyer accepts the benefit of the amicable resolution of disputes. However, it is submitted that there is no basis for determining that it would not be just to require timely submission of the Owner's claim which was presented over four months after the time limit; that no settlement discussions had taken place between 27th Aril 2017 and 3rd August 2017; and that even if they had, the Owner had not applied for an extension of time.

21. The Charterer's Lawyer therefore submits that even if, which is denied, settlement discussions had been continuing, as the parties had selected ICP (2012) for the resolution of any disputes, it was for the Owner to seek an extension of time to protect its position. The Owner failed to submit its Claims Submissions within the laid down period or seek an extension of time. The Owner's claims are therefore time-barred and must be dismissed.

22. Late service of the Owner's Claims Submissions is admitted by the Owner's Solicitor but this they have said is because English law encourages parties to try to settle disputes amicably before resorting to formal proceedings.

23. The parties were trying to settle their dispute in an effort to avoid referral to arbitration and the costs involved. The Charterer's assertion that it was incorrect to say that the parties had been in settlement discussions between 7th March 2017 and the date of service of the Owner's Claims Submissions, is denied. The parties were, or at least the Owner was, continuing to try to settle the matter as evidenced by the e-mail of 3rd August 2017.

24. The draft claims submissions presented on 3rd August 2017, were to make the Owner's position clear. The Claims Submissions were served only when it was apparent that this was the only realistic course.

25. The Owner's Solicitor challenges the Charterer's Lawyer's interpretation of ICP (2012) paragraph 12. It provides that the Tribunal can give the parties 21 days to comply with a relevant step in the proceedings. The Charterer did not ask the Tribunal for an Order for the service of Claims Submissions and so none was made. Furthermore, the power to dismiss a claim arises where there is a failure to serve claims submissions which was not the case as Claims Submissions were served.

26. The Owner's Solicitor also drew attention to Section 33 of the Arbitration Act 1996 which, in summary, requires the Tribunal to: (i) act fairly and impartially giving each party a reasonable opportunity of putting his case and dealing with that of his opponent; and (ii) adopting procedures suitable to the circumstances of the particular case so as to provide a fair means for the resolution of the matters to be determined. This confers wide procedural discretion on the Tribunal and dismissing the Owner's claims would be neither just nor proportionate.

**My findings**

27. It is common ground between the parties that the Owner's Claims Submissions were not served until after expiry of the 14 day period set out at ICP (2012) (paragraph 6(b)). The reasons are in contention.

28. The Charterer's Lawyer maintains that the content of Schutzverein's e-mail of 3rd August 2017, with its reference to an e-mail of 27th April 2017, provides documentary evidence that there were no discussions in the intervening period.

29. The Owner's Solicitor advances the opposite view that the e-mail provides evidence of settlement discussions continuing between the parties.

30. The e-mail of 3rd August 2017 has been heavily redacted by the Charterer's Lawyer because, it was said in the Defence Submissions, the contents address "without prejudice" settlement discussions. Thus, even if discussions were not actively underway at that point, it cannot be concluded that they had come to an end in April. The attached draft claims submissions were part of the negotiating process and it was only after this that there was a final breakdown and Claims Submissions were served.

31. As to the issue of the failure to extend time limits, the Charterer could, had he wished, pressed the Owner on more than one occasion. The first opportunity followed my appointment as sole arbitrator on 7th March 2017 and application could have been made to me for an Order for compliance at any time prior to service of Claims Submissions on 28th August 2017. However, the Charterer failed to make any such application and let matters rest. The point was taken only when Defence Submissions were served on 2nd November 2017.

32. Discretion is given to me at ICP (2012) paragraph 19 (a) to depart from the procedures (other than in respect of costs) in any case which the Tribunal considers to be exceptional. The circumstances of this case, with the disputed basis of the standing of settlement negotiations between the time of my appointment and the service of Claims Submissions, the Charterer's failure to seek an Order for compliance and the fact that the time-bar issue was not raised until service of the Defence Submissions, together present exceptional circumstances. Further, ICP (2012) provides for the application of English law and therefore the Arbitration Act 1996 with its requirements for the fair and impartial resolution of, and suitable procedures for dealing with, disputes. Justice and fairness would not be served by dismissing the Owner's claims.

33. For the reasons set out and in the exercise of my discretion, I find, hold and declare that the Owner's claims are not time-barred.

**The Owner's claims**

*(i) Demurrage at loading port*

34. On the evidence, the Vessel was ready to load at St Petersburg on 14th December 2016 and Notice of Readiness tendered to the Charterer at 07.00 hours local time. It was stamped as "received/accepted" by All Overseas Ltd Shipping Agency on 16th December 2016 at 17.00 hours. In accordance with Box 10, laytime commenced at 00.00 hours on 19th December 2016.

35. Loading began at 07.31 hours on 23rd December 2016. Cargo operations continued intermittently but there were no deductions from time counting. Loading was completed and time ceased to run at 11.40 hours on 28th December 2016. Preparations were made for sailing and the Vessel departed shortly afterwards.

*Calculation of time used*

36. The Owner has calculated that a total of 9 days 11 hours 40 minutes was used from the commencement of laytime at 00.00 hours on 19th December 2016 to completion at 11.40 hours on 28th December 2016. The Charterer was allowed 48 hours laytime and, after deducting this period, the remaining 7 days 11 hours 40 minutes, equivalent to 7.48611days, counted for demurrage.

37. At the rate of demurrage of USD10,000 per day pro rata, the gross amount due was USD 74,861.00. Address commission of 2.5% (USD1871.53) was deducted resulting in net demurrage of USD72,989.47.

38. I accept the Owner's calculation of the demurrage incurred at St Petersburg.

39. In accordance with Clause 18 (b) of the Charter Party, payment fell due on receipt of the invoice. The Owner's invoice to the Charterer for this amount was issued on 28th December 2016. A payment of USD45,000.00 for loading port demurrage was credited to the Owner's bank account on 30th March 2017. This reduced the demurrage due and owing leaving an outstanding balance of USD27,989.47.

40. I therefore find and hold that demurrage is due in the net amount of USD27,989.47 which I award to the Owner.

### (ii) Damages for detention at discharging port

41. On the evidence, the Vessel arrived at the customary anchorage at Kolkata at 03.00 hours on 14th February 2017 and gave Notice of Readiness to discharge her general project cargo. The Notice of Readiness was neither stamped nor acknowledged but the Statement of Facts records that it was accepted "as per BN". The pilot subsequently boarded at 09.55 hours and the Vessel made her way to berth arriving at 20.35 hours that evening.

42. Discharging commenced the same evening, 14th February 2017, at 23.25 hours. It was completed at 17.15 hours on 18th February 2017. Draft restrictions prevented the Vessel from sailing on completion of discharging.

43. An extract from the Vessel's deck log entry, which was included with the evidence presented to me, records the Vessel's draft as being 6.05m (FWD) and 6.30m (AFT). The Kolkata Port Trust's draft forecast for February 2017 was also presented to me. It showed that the estimated fresh water depth between 18th and 26th February 2017 would be 6.2 m or less, which was insufficient clearance for the Vessel to sail.

44. In an e-mail dated 20th February 2017, Captain Ghosh of the Kolkata Port Trust requested the Master to confirm that he could "make 6.4 metres even keel FW sailing draft" in which case the Vessel might be able to sail on the morning tide of 26th February 2017. In the event, this proved to be possible and with the pilot on board at 22.00 hours on 25th February 2017, the Vessel sailed at 22.25 hours.

45. Clause 16 of the Charter Party provides that time lost due to impediments beyond the Owner's control preventing the Vessel from departing from the discharging berth/port, will count as laytime or be charged as time for which damages for detention are due at the rate agreed.

46. The delay in sailing due to insufficient depth of water was an impediment beyond the Owner's control and damages for detention are payable from completion of discharging until the Vessel was able to depart. Discharging was completed at 17.15 hours on 18th February 2017 although the "Damage for detention calculation-breakdown", provided to me has been based on completion of discharging at 21.15 hours that day.

47. The Owner's calculation has been determined by reference to time lost from 21.15 hours on 18th February 2017 to the Vessel's departure when the pilot boarded at 22.00 hours on 25th February 2017, a total of 7 days 0 hours and 45 minutes or 7.03125 days. After deducting

the allowed period of 18 hours "grace time", damages for detention accrued for a total of 6 days 6 hours 45 minutes (6.28125 days).

**48.** At the rate of USD 10,000.00 per day pro rata, the gross sum due totals USD62,812.50 although the Owner's calculation has produced a lesser figure of USD 62,125.00. Address commission of 2.5% has been deducted resulting in a net amount of USD60,571.87. The Owner's invoice for this amount was issued on 28th February 2017.

**49.** I accept the reasons for and events causing the delay in sailing from the Port of Kolkata together with the Owner's calculations for damages for detention.

*The Charterer's defences*

**50.** The Charterer has said that before issuing the invoice in the sum of USD60,571.87, the Owner issued an invoice in the sum of USD21,252.00. This, the Charterer says, was based on a pro rata application of the total amount of detention between various part cargoes being carried for the Charterer and other interests.

**51.** Two heads of defence have been raised.

(i) Estoppel

**52.** The Charterer argues that because no case has been made that the original invoice was based on inaccurate information, the Owner is estopped from seeking recovery of any amount greater than the sum of USD21,252.00.

**53.** The Charterer denies the Owner's assertion that the required elements of estoppel, summarised by the Owners as reliance, to its detriment, by one party on a representation by the other, are not present. The Charterer contends that this is not the true position. The original invoice did not indicate that it was being presented on a "without prejudice" basis for settlement purposes. The circumstances clearly point to the fact that the Owner intended the Charterer to rely on the fact that a document titled invoice, was an invoice.

**54.** The Charterer further denies the Owner's argument that the Charterer did not rely on the invoice because it remained unpaid. The Charterer submits that the invoice remains unpaid because of the Owner's subsequent attempt to recover a greater sum.

**55.** The Owner has countered that there was no need to mark the document "without prejudice". The Owner had previously been willing to accept the sum of USD21,252.00 to close the matter but this was without prejudice to its rights to claim the full amount of the damages for detention. The Charterer did not agree to pay the lower amount. The Owner, citing *Maritime Transport Operators G.m.b.H. v. Louis Dreyfus et Cie ("The Tropwave")* [1981] 2 Lloyd's Rep 159, was therefore entitled to the full amount claimed.

*My conclusions on estoppel*

**56.** The Charterer's assertion that it should be able to rely on the invoice as being the invoice, is a superficially attractive argument. Had the Charterer relied on it and made the payment, that would have been the end of the matter.

57. However, the Charterer did not settle the amount of the invoice. The Charterer states that the Owner has offered no evidence of inter-party exchanges in support of the Owner's contention that the original invoice was an invitation to settle the matter quickly. But neither has the Charterer adduced any evidence of exchanges to demonstrate the basis of settlement negotiations.

58. The only documentation I have is the copy of Schutzverein's e-mail of 3rd August 2017. It was included in the Charterer's Defence Submissions but in heavily redacted form because the content related to "without prejudice" settlement discussions. This fatally undermines the Charterer's estoppel argument. The invoice for USD21,252.00 was part of a negotiating process which failed when there was no agreed settlement.

59. I do not accept the Charterer's argument. The Owner is not, therefore, estopped from pursuing its claim for recovery of the full amount of damages for detention at the Port of Kolkata.

(ii) Double recovery

60. The Charterer argues that allowing recovery of the full amount of damages for detention at the discharging port would result in an unjustified windfall for the Owner. The Charterer was one of a number of part charterers and seeking the full sum claimed from each of the other charterers would compensate the Owner for an amount in excess of its damages.

61. The Owner argues that the Charter Party is a contract between the Owner and the Charterer and that no other party is involved. The Charter Party does not provide for the rate of demurrage or damages for detention to be pro-rated between any other parties. Therefore, there is no legal basis for pro-rating any amounts.

*My conclusions on double recovery*

62. I can dispense quickly with this argument. The Charter Party was concluded between the Owner and the Charterer. Damages for detention are at the stated rate of "USD10,000 per day pro rata" in Box 18 and Clause 16 provides, in material part, that "damages for detention are due at the rate stated in Box 18".

63. There is nothing in the Charter Party, express or implied, that damages for detention are to be pro-rated with any other cargo interest. The agreed rate is the basis for the determination of damages for detention between the Owner and the Charterer.

64. I do not accept the Charterer's argument. The amount determined represents the Charterer's liability to the Owner without any sharing or pro-rating with any other interests.

*My conclusion on the claim for damages for detention*

65. I find and hold that damages for detention at the Port of Kolkata accrued in the net sum of USD 60,571.87 and I award this amount to the Owner.

(iii) Interest on late payments

The Owner claims interest, in accordance with Clause 28 of the Charter Party, at the rate of 1.5% per month pro rata for the late payment of:

(a) Freight

**66.** The sum of USD273,000.00 (which I understand to be the net amount after deduction of address commission of 2.5%) was due within three banking days of completion of loading. Loading was completed on 28th December 2016. The Owner's Claims Submissions seek interest between 1st January 2017 and 30th January 2017 in the sum of USD3,822.00.

**67.** The late payment has not been denied. However, the Owner's invoice, in the amount of USD3,822.00, quantifies payment as being due for 28 days. The amount owing is therefore overstated. I have given the Charterer the benefit of the doubt and recalculated the claim for 28 days' interest at USD3,698.71.

**68.** I therefore find and hold that interest on the late payment of freight amounts to USD3,698.71 and I award this sum to the Owner.

(b) Loading port demurrage

**69.** Clause 18 of the Charter Party provides for the payment of demurrage on receipt of the Owner's invoice. There is no dispute about the quantum of demurrage accrued at the loading port. The net sum of USD72,989.47 fell due for payment on 29th December 2016. A remittance of USD45,000.00 was made by the Charterer to the Owner's bank on 29th March 2017.

**70.** The Owner claims interest of USD3,321.02 on the full amount of demurrage for 91 days from 29th December 2016 to 29th March 2017 in accordance with an invoice dated 19th May 2017. I accept the Owner's calculation.

**71.** I therefore find and hold that interest due on the full amount of demurrage between 29th December 2016 and 29th March 2017 amounted to USD3,321.02 and I award this sum to the Owner.

**Costs**

**72.** ICP (2012) provides for costs to be awarded on a summary and commercial basis and in such manner and amount as the Tribunal, in its absolute discretion, considers to be fair, reasonable and proportional to the matters in dispute. It is further provided that costs are to be capped so that neither party shall be entitled to recover more than a sum equivalent to 30% of the Claimant's monetary claim. Costs are assessed from the breakdown to be provided by the parties prior to the Tribunal proceeding to its Award. The parties served their respective costs summaries on the Tribunal and each other on 15th January 2018.

**73.** The Owner has largely been successful in the claims made. In accordance with English law costs normally follow the event.

**74.** The Owner's claimed recoverable costs amount to £9,878.50 with a further USD 1,377.50 (equivalent to £1,010.81 at the exchange rate on 12th January 2018 of USD1.363=£1) for disbursements covering fees to lawyers in the USA thus totalling £10,889.31. The Owner's claim amounts to USD95,704.36 and so the claimed costs are below the capping level.

75. It is therefore my task to assess the reasonableness of the costs.

76. I have examined the summary provided by the Owner's Solicitor. I consider the sum of £5,816.50 for Document Preparation/Drafting Submissions/Responses to be higher than I would expect. A more appropriate figure would be £4,950.00 which I have allowed. This results in a reduction of £866.50.

77. I am satisfied that other itemised charges for professional services are fair and reasonable for the work involved. I am also satisfied that the cost of routine exchanges and disbursements incurred are fair and proportionate.

78. I therefore accept, find and hold that costs of £10,022.81 were reasonably and equitably incurred in connection with this Award. I award this sum to the Owner as well as the fees and costs of this arbitration.

**Interest**

79. The Owner has claimed interest on the outstanding amounts.

80. In accordance with my powers under Section 49 of the Arbitration Act 1996, I find and hold that the Owner is entitled to interest on the sums awarded at a commercial rate, compounded at three monthly rests as is usual in London arbitrations.

81. I find and hold that interest on the outstanding amount of demurrage incurred at the Port of St Petersburg shall run from 30th March 2017.

82. I further find and hold that interest on the damages for detention at the Port of Kolkata shall run from 3rd August 2017.

83. And I further find and hold that interest on the late payments shall run from the date of this Award.